UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| United States of America, | Case No. 18-cr-84 (SRN/DTS) |
| Plaintiff, | |
| v. | **REPORT AND RECOMMENDATION** |
| Draveetray Lyrell Williams, | |
| Defendant. | |

Nathan Nelson, Assistant U.S. Attorney, U.S. Attorney's Office, 300 South Fourth Street, Suite 600, Minneapolis, MN 55415, for Plaintiff

Andrew Irlbeck, Andrew Irlbeck, Lawyer, Chartered, 332 Minnesota St., Suite W1610, St. Paul, MN 55101, for Defendant

Defendant Draveetray Williams is charged with being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1). Criminal Complaint, Docket No. 1. Williams moves to suppress evidence seized as a result of a search of his car on the ground that police lacked probable cause for the search. An evidentiary hearing was held on May 28, 2019.[1] For the reasons stated below, the Court recommends that Williams's motion to suppress be denied.[2]

---

[1] A transcript of the hearing, which heard testimony from Officer Martell and Officer Slater, is found at Docket No. 39.

[2] Three exhibits were received at the May 28, 2019 hearing. Exhibit 3 is Officer Martell's body-worn camera video. Exhibit 4 is the Officer Slater's body-worn camera video and Exhibit 5 is his squad car video. Government Exhibits 1 and 2 were not offered at the hearing because they pertain to the separate motion to suppress [Docket No. 21] that was withdrawn by Williams [Docket No. 28]. *See* Tr. 67-68, Docket No. 39.

**FINDINGS OF FACT**

On February 15, 2019 St. Paul Police Officer Nicholas Martell responded to a call of an assault in progress at a gas station located at the intersection of Rice Street and Maryland Avenue. Tr. 6. He was wearing a body-worn camera that was recording during his response to the call. *Id.* at 15. Within 30 seconds to one minute, he arrived at the gas station and was flagged down by the apparent victim and his wife. *Id.* at 7; Ex. 3 1:00-:17. The victim said a man had pulled a gun on him and just drove off eastbound on Maryland in a "silver Challenger." Tr. 7, Ex. 3 1:02-:05. The victim's wife told Officer Martell, "he has a gun, he just pulled it out in front of my kid." Ex. 3 0:56-:57. Officer Martell told the victim to stay there, and he left the gas station driving eastbound on Maryland. Tr. 7. Officer Martell radioed the description of a silver Challenger traveling eastbound on Maryland and that the suspect had pulled out a handgun. *Id.* at 8, Ex. 3 1:15-:24.[3] The police radio can be heard repeating the description of the car as a silver Challenger with the suspect having pulled out a handgun. Ex. 3 1:27-:30. After traveling a few blocks without seeing the car, Officer Martell returned to the gas station to talk to the victim. Tr. 7-8.

When Officer Martell returned to the gas station, he was approached by a witness to the assault, D.O., who told him that he had witnessed the assault (though he did not see the gun) and saw the suspect get into a silver car and leave the gas station. *Id.* at 9. Officer Martell then interviewed the victim, who told him about the assault and

---

[3] At the hearing, the Assistant U.S. Attorney's question said silver "Charger" rather than Challenger, and Officer Martell did not correct him. Tr. 8. However, it is clear on the body cam video that Officer Martell radioed a description of a silver Challenger heading eastbound on Maryland. Ex. 3 1:17.

2

the events leading up to it. *Id.* at 10. He said he was at the gas station (where he was employed) when his wife walked in and told him a man had hit her car with his car door. He went outside and talked to the man. Then a man at the gas pump started talking to the victim, brandished a handgun, racked the slide on the gun, and said, "Get back in the car before I start shooting; I'll take your life." *Id.* at 10-11, 23-24. He said the man then threw the gun in the car, approached him with his fist up, and the two men started fighting. *Id.* at 10-11. During the fistfight a set of car keys fell to the ground. The victim picked them up because he thought they were his, but it turned out they belonged to the other man. *Id.* at 11, 16. After the victim knocked the other man to the ground during the fistfight, several black men got out of a nearby van and started pummeling the victim. *Id.* at 23, 26-27, Ex. 3 40:11-:55. As one eyewitness to the assault described it, these men were hitting the victim and kicking him in the head and he thought they were going to kill him. Ex. 3 6:38-10:50. Officer Martell asked the victim about his injuries; observed scrapes and bruises on his face, elbows, hands, and back; and photographed the injuries. Tr. 15.

Officer Benjamin Slater was on patrol in his squad car when he heard the call about an assault at the gas station at Rice and Maryland. *Id.* at 29-30. He was about four miles away. *Id.* at 30. While en route to the gas station, he heard Officer Martell radio that the suspect had left in a silver, two-door Challenger heading eastbound on Maryland. *Id.* Officer Dean from the Gang Unit radioed that he knew a Draveetray Williams who was known to drive a two-door Dodge Challenger and to carry weapons. *Id.* at 31. He also said Williams has silver-grilled teeth. *Id.* at 32.

Officer Slater drove around the area for 25 to 30 minutes, but had given up searching when, as he drove down Maryland Avenue, he saw a silver two-door Challenger that appeared to be stuck at the end of an alley trying to get out onto Maryland. *Id.* at 32-33. (The alley cannot be seen from the gas station premises because of a privacy fence. *Id.* at 33.) Officer Slater circled the block and drove up the alley behind the car. *Id.* at 34. He heard the engine revving and believed the tires were spinning as the car appeared to be rocking back and forth trying to get unstuck from the snow. *Id.* Officer Slater thought the car might be associated with the earlier assault call and was also concerned it might become unstuck from the snow, gain traction, and go out onto Maryland Avenue and cause an accident. *Id.* at 35, Ex. 4 1:50-:55. He stopped his squad car behind the silver Challenger and turned on his emergency lights, which automatically activated the dash camera. Tr. 35, 45. He also was wearing a body-worn camera that was recording at this time. *Id.* at 44-45.

Officer Slater walked up to the driver's side window, talked to the driver, and got his driver's license identifying him as Draveetray Williams. *Id.* at 35-36. Williams told him he was looking for his car key fob and could not turn his car off because he did not have the key fob. *Id.* at 37. Officer Slater asked him how he got the car started then, where he was coming from, and Williams answered, "Just right here in the area." Ex. 4 2:09-:26. Office Slater observed that Williams had cut, bloody knuckles on his left hand, and he smelled the distinct odor of marijuana. Tr. 37-38, 48, 62. He had Williams stay in the car while he walked back to his squad car to contact Officer Martell for a description of the suspect and a summary of the incident at the gas station. *Id.* at 12, 39. Officer Slater told Officer Martell he had a vehicle stopped that matched the description of the

4

earlier radio report of a silver Dodge Challenger and that the driver had blood on his knuckles, but did not mention he smelled marijuana coming from the car. *Id.* at 11-12, 20, Ex. 4 8:20-10:15. Officer Martell relayed to Officer Slater the description he had been given by the victim: a black male approximately 6'2" to 6'3", 160-170 pounds, with silver teeth both top and bottom, wearing a gray sweatshirt and gray sweatpants. Tr. 12, 39, Ex. 3 30:56-32:38.

Officer Slater observed that Williams fit the description and called for back-up. Tr. 39. When the other officers arrived, Officer Slater returned to the driver's side of the car, had Williams get out of the car, did a pat search of him for weapons, handcuffed him, and put him in the back of his squad car. *Id.* at 40. As Williams was being taken away from his car, another officer on-scene can be heard on Officer Slater's body cam video asking Williams, "There any narcotics in there? It smells like weed in there." Williams says no, and an officer again says, "Well, it smells a lot like weed in there." *Id.* at 48-49, Ex. 4 14:52-15:00. Officer Slater testified he did not tell the other officers that he smelled marijuana, but he was part of the conversation in which the other officers discussed the smell of marijuana coming from the car before the car was searched. Tr. 48-49, 61.

Officer Slater told Williams he was being detained as part of an investigation into an assault and that they would be doing a show-up with the alleged victim. *Id.* at 13, 40. Williams admitted he had been in a fistfight and told the police to go look at the video to see who swung first, that the other guy picked him up and slammed him, and he did not know the other men, who were Somali, who came to his aid in the fight. *Id.* at 40-41, Ex. 4 15:55-16:39.

5

Officer Martell brought the victim to the location where the Challenger was stopped, explained the show-up process, and stated that the man in the show-up may or may not be the suspect. Tr. 13. Officer Slater brought Williams to the front of Officer Martell's squad car in the alley, had him face the front and the side. The victim identified Williams as the one with the handgun. *Id.* at 13-14, 41.

Even before the show-up, Officer Slater and the other officers on-scene had determined they would search the car based on the marijuana smell coming from it. Officer Slater also believed the car was associated with the assault at the gas station. *Id.* at 42, Ex. 4 18:15-:40. When Officer Slater returned to the Challenger from the show-up that took place farther down the alley, other officers had already started to search the car. Tr. 42. The purpose of the search was to look for marijuana and for a gun involved in the incident at the gas station. *Id.* at 43. After Officer Slater had joined the search, they opened the hood and found two plastic bags in the engine compartment, looked into the bags, and saw a green, leafy substance he believed to be marijuana. *Id.* at 42-43. At some point during the search another officer found a small quantity of marijuana under the passenger seat. *Id.* at 49.

The officers continued searching and Office Slater found a pistol inside the driver's side door in the compartment under the armrest control panel for the windows and the door locks. *Id.* at 43. The panel contains the buttons that open and close the windows and lock the doors. *Id.* at 44. Officer Slater used the point of a knife to lift up the corner of the panel, showing that it was not permanently affixed to the armrest, and then lifted the panel piece off the armrest which revealed a compartment in which he found a firearm, ammunition, and a digital scale. *Id.* at 43-44, 52, Ex. 4 39:00-42:00. He

6

used the knife only to get under and lift up the panel; he did not cut into the car or cause damage to it. Tr. 62. Past discussions with officers about hiding places for weapons led him to turn his attention to the door compartment, though he did not have any particularized suspicion regarding this door compartment in this car. *Id.* at 52, 65.

## CONCLUSIONS OF LAW

Williams moves to suppress the evidence from the warrantless search of his car. His motion is a hodge-podge of arguments, some challenging the applicability of the automobile exception to the facts of his case, others challenging the existence of probable cause to search his car and still others challenging the scope of the search itself.

The Fourth Amendment prohibits all unreasonable searches and seizures. U.S. Const. amend. IV. Searches conducted without a warrant are unreasonable, subject only to certain specifically established exceptions. *United States v. Ross*, 456 U.S. 798, 824 (1982). One such exception is the automobile exception.

Under the Fourth Amendment a warrantless search of a car is valid if based on probable cause. *Ornelas v. United States,* 517 U.S. 690, 693 (1996). Probable cause to search exists where the "known facts and circumstances are sufficient to warrant a [person] of reasonable prudence in the belief that contraband or evidence of a crime will be found." *Id.* at 696. "The scope of a warrantless search based on probable cause is no narrower – and no broader – than the scope of a search authorized by a warrant supported by probable cause. Only the prior approval of the magistrate is waived; the search otherwise is as the magistrate could authorize." *Ross*, 456 U.S. at 823. The scope of a warrantless search of an automobile thus is "not defined by the nature of the

7

container in which the contraband is secreted" but rather "by the object of the search and the places in which there is probable cause to believe that it may be found." *Id.* at 824.

I.  **Mobility of the Car**

Williams argues that the automobile exception does not apply in this case because that exception is premised on the mobility of the car. He contends his car was not mobile because it was stuck in the snow at the end of the alley, and he did not possess the key fob. Tr. 13. Therefore, he argues, because the automobile exception does not apply, police needed a warrant to search the car. The Court disagrees.

To begin, the car's lack of mobility was only temporary, caused by the accumulation of snow at the end of the alley. The car could become unstuck and be driven away by shoveling some snow, pushing the car, pulling it with a tow line, or putting down sand or other materials to gain traction under the tires. The car was not disabled and had not lost its "inherent mobility." *See United States v. Maggard*, 221 F.3d 1345 (per curiam) (unpublished) (Table of Decisions) (8th Cir. 2000), 2000 WL 680394, at *1 (affirming denial of motion to suppress and finding that "although not readily mobile, the pickup truck did not appear to have lost its inherent mobility" and was "merely stuck in a ditch"). In contrast, in the case Williams cites, *United States v. O'Connell,* 408 F.Supp.2d 712, 723 (N.D. Iowa 2005), the automobile exception did not apply because the vehicle was on private property, not readily movable, not registered to operate on public streets, and by all reasonable appearances was not being used as a vehicle.

The fact that Williams did not have his key fob did not make the car immobile. In fact, he was driving it without the key fob at the time it got stuck in the alley. Williams told Officer Slater he could not turn the car off because he did not have the key fob, but the Court understands this to mean not that the car literally could not be turned off without the key fob but that, if he turned it off, the only way to start it again was with the key fob. Thus, if he turned off the car, he would be unable to re-start it and drive away. None of these considerations supports the idea that his car was "immobile" for purposes of the automobile exception.

Any temporary loss of mobility is insufficient to take Williams's case outside the automobile exception. As the Supreme Court has stated:

> The reasons for the vehicle exception, we have said, are twofold. Besides the element of mobility, less rigorous warrant requirements govern because the expectation of privacy with respect to one's automobile is significantly less than that relating to one's home or office.
>
> Even in cases where an automobile was not immediately mobile, the lesser expectation of privacy resulting from its use as a readily mobile vehicle justified application of the vehicular exception.

*California v. Carney*, 471 U.S. 386, 391 (1985) (internal quotations omitted).

## II.  Probable Cause

Williams raises several arguments challenging the officers' probable cause to search his car: (1) that neither he nor his car matched the descriptions that were given; (2) that there was no crime committed; and (3) that the police did not smell marijuana emanating from his car. None of these arguments is persuasive.[4]

---

[4] Williams's brief uses imprecise language that muddles his argument. For example, he argues that Officer Slater did not have probable cause for the car search because he did not have a "reasonable suspicion" to do so. To the extent Williams intends by this

9

### A.  Description of Williams and the Car

Williams argues the "information given to police did not give them probable cause to search the vehicle, because the vehicle and Williams were inaccurately described." Def. Br. 9, Docket No. 41. Williams's muddled argument about the description of the car is without merit. He contends the car was "not accurately described by the witnesses. It was always a silver four-door Charger sedan, not a grey two-door Challenger coupe." *Id.* at 12. He asserts that the alleged victim said Williams put the gun "in his vehicle, a grey Dodge Challenger (a two-door vehicle)." *Id.* at 2. He further states that the police aired the report of the suspect's car as a "silver Dodge Charger sedan (four-door vehicle). (Tr. at 8-9.) This call inaccurately described the vehicle Williams would later be found in, which was a grey Dodge Challenger, with only two doors. Williams was not driving a silver sedan at any time, nor a Charger. Only a grey Challenger." *Id.* Williams also asserts that Officer "Martell and all other witnesses testified it was a four-door Charger they were searching for. (Tr. at 33.)" *Id.* at 5. These assertions do not accurately recite the record.

Officer Martell testified that the victim told him the man with the gun drove off in a silver Challenger. On his body cam video, when Officer Martell initially responds to the

---

phrase to suggest the initial investigatory interview and detention were unconstitutional (and therefore the eventual search must be suppressed as fruits of the illegal investigatory stop), this argument is unavailing. As the record clearly establishes, Officer Slater had ample reason during his initial encounter with Williams to suspect Williams was involved in the altercation at the gas station and thus could be detained for further investigation.

10

911 call and is flagged down by the victim at the gas station, the victim can be heard saying the car is a silver Challenger, and Officer Martell can then be heard radioing in the description as a silver Challenger.

Officer Slater testified that, based on that description, he drove his squad car around the area looking for a silver Challenger. When Officer Slater saw the car stuck in the snow at the end of the alley just east of the gas station, he reported that it matched the description of the silver Dodge Challenger involved in the incident at the gas station and that the driver had bloody knuckles on his left hand. Officer Slater also testified that Gang Unit Officer Dean later provided information over the radio that he knows a Draveetray Williams matching Officer Martell's description who is known to drive a Dodge Challenger. When Officer Slater obtained the driver's license it identified him as Draveetray Williams.

The Government asserts that Williams "was driving a vehicle that exactly matched the description of [the] vehicle given by the victim – a silver, two-door Dodge Challenger." Gov't Br. 11, Docket No. 42. It appears to the Court that this is true, based on the record. But whether the car is in fact gray or silver makes no material difference to the identification in the circumstances of this case, nor is the Court concerned about anyone's use of the word "sedan." *See United States v. Perry,* 908 F.3d 1126, 1129 (8th Cir. 2018) (noting that, despite some inconsistencies, defendant matched the material aspects of the suspect's description). Similarly, the fact that on occasion someone said Charger rather than Challenger is of no consequence in the circumstances here.[5]

---

[5] For example, on Officer Martell's body cam video he can be heard a few times saying Charger instead of Challenger, and there is a short is-it-Charger-or-Challenger

11

As to Williams's assertion that he was "inaccurately described," the Court sees no argument in his brief asserting that he did not match the physical description of the suspect, though there is a single reference in the Facts section of the brief that Williams was "not wearing a grey sweat-suit." Def. Br. 5, Docket No. 41. Moreover, Williams appears to match the general physical description given, including in particular the silver front teeth. Tr. 39. Williams has failed to identify any way – other than the sweatsuit – that his description varied from that of the assailant. Accordingly, the Court finds this argument is unpersuasive and waived.

B.   **Description of a Crime**

Williams also argues that the information from the victim regarding his actions with the gun did not describe a crime and therefore the police lacked probable cause to search his car for evidence of a crime. Def. Br. 10-11, Docket No. 41. He contends the "alleged victim described [defendant] displaying a handgun, but then placing it safely in his car, and the two men voluntarily engaging in a fist fight." *Id.* at 10. "The alleged victim actually won the fight, and took Williams's keys." *Id.* He asserts that the "fact that the alleged victim agreed to a fist fight with Williams immediately after Williams displayed a firearm is persuasive evidence that the alleged victim did not believe Williams was going to use the firearm." *Id.* He also says he did not point the gun at the victim and contends that the words do not amount to a "direct threat" or a "true threat" but only a "contingent threat" that "does not place a reasonable person in immediate fear of great bodily harm." *Id.* at 10-11.

---

conversation among Officer Martell and other officers inside the gas station after he has talked to the witness D.O. Ex. 3 13:48-14:00. *See also* footnote 3.

The Court disagrees. Williams mischaracterizes what the victim told Officer Martell about the man with the gun. The victim did not say or suggest that Williams displayed the gun and then "plac[ed] it safely" in his car so the two of them could engage in a consensual fistfight. He said Williams racked the slide of the gun – he can be seen on Officer Martell's body cam video demonstrating this action and saying it made a noise [Ex. 3 33:04-:15] – threatened to start shooting and to kill him, and then threw the gun into the car and approached him with his fist up. The fact that Williams did not directly point the gun at the victim; that the victim had knocked Williams to the ground during the fistfight; that the witness D.O. did not see a gun; and that all or most of the victim's injuries were inflicted by the other men who started assaulting him after he and Williams had started fighting and after Williams drove off, do not change the facts regarding what the victim told police about Williams's actions with the gun and his statements that he would start shooting and would kill the victim.

The information from the victim gave police probable cause to believe that a crime had been committed by the man described by the victim and that the car would contain evidence – the gun – of that crime. *See, e.g.,* Minn. Stat. § 609.713 (threats of violence); § 609.222, subd. 1 (assault with a dangerous weapon); § 609.224 (assault).

### C.   Odor of Marijuana

Williams also argues that police lacked probable cause to search the car because "Officer Slater did not actually smell the odor of marijuana until after he began an invasive search of the vehicle." Def. Br. 9, Docket No. 41.

Officer Slater testified that he smelled the distinct odor of marijuana when he first approached Williams's car and talked with him through the driver's side window to get

13

his driver's license, though he did not communicate to anyone else at the scene that he smelled marijuana. Williams argues that Officer Slater's claim that he smelled marijuana is "specious at best" because he "did not note the odor on his body cam or squad video, nor communicate it to Martell, nor any other officer prior to searching. Instead, he began to search the vehicle too eagerly." *Id.* at 12. But Williams's description here does not fully reflect Officer Slater's testimony or what is plainly shown and heard on both his body cam video and squad video regarding statements by another officer who smelled marijuana through the open window or door when Williams first stepped out of the car.

When Williams was handcuffed and being taken away from the door of his car, an officer can be heard on Officer Slater's body cam video asking Williams, "There any narcotics in there? It smells like weed in there." Williams says no, and an officer again says, "Well, it smells a lot like weed in there." While Officer Slater was occupied with Williams and waiting for Officer Martell to arrive so they could do the show-up, the other officers on-scene began to search Williams's car. Crediting the testimony of Officer Slater and the body cam video, the police had probable cause to search the car based on the odor of marijuana coming from the car. *See United States v. Smith*, 789 F.3d 923, 928-29 (8th Cir. 2015) (finding "the smell of marijuana, along with the credible testimony by the officer, is sufficient to establish probable cause to search an automobile and its contents.").

Officer Slater's attention was on the assault call and the report that the man who had a gun and threatened the victim at the gas station had driven off in a silver Challenger. The description of the suspect matched Williams. When Officer Slater first put Williams in the back of his squad car, he told Williams they were going to do a

14

show-up regarding the assault at the gas station. In response, Williams admitted to being involved in the altercation at the gas station, though suggested he acted in self-defense. Officer Slater proceeded to do the show-up, with Officer Martell driving the victim over to the alley in his squad car. Officer Slater did not join the search of the car until after the show-up and after he put Williams in the back of his squad car for the second time. When he did, Officer Slater had even more probable cause to search Williams's car. It is after this point that the gun was recovered.

Regardless, at the time the search was commenced the officers had probable cause to believe they would find contraband and, based on the description of Williams and the car, that it would contain evidence of the assault. That initial probable cause was enhanced by Williams's admission, by the discovery of the marijuana, and by the results of the show-up, all of which occurred before the recovery of the gun.

### III.   Scope of the Search

Finally, Williams challenges the scope of the search with respect to the compartment in the car door in which the gun was found. Def. Br. 16, Docket No. 41. He argues that the "Supreme Court has previously decided that whether probable cause existed to search behind panels in a vehicle turned on whether or not the officer had a suspicion particularized to the panel," citing *Ornelas*, 517 U.S. at 700. Here, he argues, Officer Slater testified that he did not have such particularized suspicion. Williams further argues that there was "no probable cause to allow Slater to use his knife to open door panels on the car . . . knowing that investigators offered to write a warrant for the car." Def. Br. 16, Docket No. 41.

The Court has found that police had probable cause to search the car for a gun and for drugs. Therefore, police could lawfully search every part of the car and its contents that could conceal the objects of the search. *See Ross,* 456 U.S. at 825; *United States v. Murillo-Salgado*, 854 F.3d 407, 418 (8th Cir. 2017). Officer Slater's search of the compartment under the armrest control panel was proper. His testimony, together with his body cam video, make clear that all he did was lift up the edge of the panel with the point of his knife. The panel, which normally would be permanently affixed to the armrest of the car door, easily lifted up to reveal and provide access to the compartment underneath. The body cam video demonstrates that it took no great effort, exertion, or force to dislodge and lift the control panel. Officer Slater did not cut, damage, unfasten, or dismantle any part of the door, the armrest, or the control panel. Any cutting away or alteration to the control panel and armrest had already been done by Williams or someone other than police, so that the control panel basically functioned as a removable cover to a compartment in the door. After the edge of the control panel readily lifted up, Officer Slater reached into the compartment, where he discovered a gun, ammunition, marijuana, and a digital scale.

Officer Slater testified that past discussions with officers about hiding places for weapons led him to turn his attention to the door compartment, and that he did not have any particularized suspicion about this door compartment in this car. But none was required. The *Ornelas* case cited by Williams does not compel a different conclusion. As the Supreme Court there observed:

> [O]ur cases have recognized that a police officer may draw inferences based on his own experience in deciding whether probable cause exists. To a layman the sort of loose panel below the back-seat armrest in the

> automobile involved in this case may suggest only wear and tear, but to Officer Luedke, who had searched roughly 2,000 cars for narcotics, it suggested that drugs may be secreted inside the panel. An appeals court should give due weight to a trial court's finding that the officer was credible and the inference was reasonable.

*Id.* (internal citations omitted).

Contrary to Williams's assertions, *Ornelas* does not impose a "particularized suspicion" requirement and, in fact, it validates what Officer Slater did here, as the above passage shows. He turned his attention to the control panel on the armrest at least in part because other officers shared with him their experience regarding hiding places for weapons.

Finally, Williams argues there was "no probable cause to allow Slater to use his knife to open door panels on the car . . . knowing that investigators offered to write a warrant for the car." Def. Br. 16, Docket No. 41.[6] The fact that officers not on-scene said they could write up an application for a search warrant has no bearing on the permissible scope of Officer Slater's search of the car in the circumstances presented here. Williams seems to argue that the officers' ability to secure a warrant means Officer Slater was required to do so. But in fact the opposite is true. So long as there is probable cause that would satisfy a warrant, the automobile exception means that an officer may search the car without a warrant. *See Ross,* 456 U.S. at 825.

---

[6] During the search, Officer Slater told the other officers that a Drug Task Force officer could write up an application for a warrant. Tr. 55, 58, 64.

## RECOMMENDATION

IT IS HEREBY RECOMMENDED that Defendant Draveetray Lyrell Williams's Motion to Suppress Evidence Obtained as a Result of Search and Seizure [Docket No. 22] be DENIED.

Dated: August 5, 2019

                                         s/David T. Schultz
                                         DAVID T. SCHULTZ
                                         United States Magistrate Judge

## NOTICE

**Filing Objections:** This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals.

Under Local Rule 72.2(b)(1), "a party may file and serve specific written objections to a magistrate judge's proposed finding and recommendations within 14 days after being served a copy" of the Report and Recommendation. A party may respond to those objections within 14 days after being served a copy of the objections. LR 72.2(b)(2). All objections and responses must comply with the word or line limits set for in LR 72.2(c).