# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| United States of America,<br><br>   Plaintiff,<br><br>v.<br><br>Draveetray Lyrell Williams,<br><br>   Defendant. | Case No. 19-CR-00084 (SRN/DTS)<br><br><br>**ORDER** |

Nathan Hoye Nelson, Department of Justice-United States Attorneys Office – Criminal Division, 300 South Fourth Street, Suite 600, Minneapolis, Minnesota, 55415, for Plaintiff.

Andrew M. Irlbeck, Andrew Irlbeck, Lawyer, Chartered, 332 Minnesota Street, Suite W1610, Saint Paul, Minnesota, 55101, for Defendant.

---

SUSAN RICHARD NELSON, United States District Judge

Before the Court are Defendant Draveetray Lyrell Williams' Objections ("Objections") [Doc. No. 44] to Sections IIA, IIB, and III of the August 5, 2019 Report and Recommendation ("R&R") [Doc. No. 43] filed by Magistrate Judge David T. Schultz. The R&R addressed Williams' pretrial motion to suppress evidence seized as a result of a search of his car on the ground that police lacked probable cause for the search. The magistrate judge held an evidentiary hearing on the motion on May 28, 2019. In his R&R, the magistrate judge denied Williams' motion in its entirety. (*See* R&R [Doc. No. 43] at 18.)

For the reasons set forth below, Williams' Objections are overruled, and the R&R is affirmed and adopted in full.

## I.     BACKGROUND

### A.     Altercation at Gas Station

On February 15, 2019, St. Paul Police Officer Nicholas Martell responded to a call that an assault was in progress at a gas station located at the intersection of Rice Street and Maryland Avenue.[1] (Tr. [Doc. No. 39] at 6–7.) Upon arrival, he was flagged down by a male—later identified as the victim—who informed him that another male had "just pulled a gun on him and left eastbound [on] Maryland in a silver Challenger." (*Id.* at 7.) Martell told the victim to remain at the gas station, and spent a few minutes searching for the vehicle nearby. (*Id.* at 7–8.) When his search turned up nothing, he radioed out a description of the suspect's vehicle—describing it as a "silver Challenger"—and returned to the gas station.[2] (Martell Body Cam Footage [Gov't Ex. 3] at 1:05 (victim describing vehicle as a silver Challenger), 1:17 (radioing out description of vehicle as a "silver Challenger" and the firearm involved as a "silver handgun")).

Upon returning to the gas station, Officer Martell could not initially locate the victim. (Tr. [Doc. No. 39] at 8–9.) However, he was approached by a citizen who informed

---

[1]     Martell's body camera was on and recording during his response to the call. (Tr. [Doc. No. 39] at 15; Martell Body Camera Footage, [Gov't Ex. 3].)

[2]     At the evidentiary hearing, the Assistant United States Attorney's question asserted that Martell's radio call to other officers described the suspect's car as a "silver Charger." (Tr. [Doc. No. 39] at 8.) Martell did not correct the attorney at the hearing. However, as the magistrate judge noted, the body camera footage clearly recounts Martell describing the vehicle as a "silver Challenger." (Martell Body Camera Footage [Gov't Ex. 3] at 1:17.) At one point, there is a discussion of whether the vehicle was a Challenger or a Charger, (*see id.* at 13:45–14:10), but Martell later confirmed with the victim that the vehicle was a silver two-door Dodge Challenger, (*see id.* at 24:45–25:22.)

the officer that he was a witness to the assault. (*Id.*; Martell Body Camera Footage [Gov't Ex. 3] at 6:30–13:25 (Martell taking witness statement).) Martell interviewed the witness, who informed him that he had seen a "light-skinned male"—later identified as the victim— exchanging words with a black male at the gas pumps. (Tr. [Doc. No. 39] at 9.) The two men then engaged in a fistfight, at which point eight to ten other black males exited a nearby van and began to assault the victim.[3] (*Id.* at 9, 19.) The black male that was initially involved with the fist fight then entered a "silver sedan" and left. (*Id.* at 9.) The witness did not report seeing a firearm at any point during the assault. (*Id.*; Martell Body Camera Footage [Gov't Ex. 3] at 9:45–10:00.)

Martell entered the gas station to review any surveillance video that might be available. (Tr. [Doc. No. 39] at 9–10.) While inside, the victim walked into the camera-viewing room, at which point Martell learned that he was an employee at the gas station. (*Id.* at 10.) The victim provided additional information to Martell:

> [The victim] stated he was at the gas station, [when] his wife walked in [and] told him that a male had hit her car with his car door, so he went outside to approach that male and was talking to him when a black male at the gas pumps started talking to him and they were exchanging words and he – the black male at the gas pump . . . *racked the slide on the handgun* [and] said, *Get back in the car before I start shooting* [and] *I'll take your life*. [The victim] said [the black male then] threw the gun in the car, approached him with his fist up, and they started physically fighting.[4]

---

[3]     At the evidentiary hearing, Martell testified that he could not remember why no description was obtained of the van or other males who attacked the victim. (Tr. [Doc. No. 39] at 19.) He did, however, obtain a description of the van, albeit limited by the witness's scant details. (*See* Martell Body Camera Footage [Gov't Ex. 3] at 1:22:00–1:23:00.)

[4]     Martell testified that "rack[ing] the slide" on the handgun would "put a round in the chamber" of the firearm, assuming the magazine was loaded and the firearm was functioning properly. (Tr. [Doc. No. 39] at 24.)

(*Id.* at 10 (emphasis added); Martell Body Camera Footage [Gov't Ex. 3] at 29:40–37:00 (obtaining from victim a full description of the incident and a description of the suspect).) The victim never alleged that the firearm was pointed at him. (Tr. [Doc. No. 39] at 16.) Martell did state that the victim reported throwing a few punches himself during the fist fight, and that Martell never investigated the victim as the possible aggressor or potential robber. (*Id.*) He also noted that the third-party witness's description of the fight could be construed as making it sound like the victim assaulted Williams, after which the victim was assaulted by the other men from the van. (*Id.* at 27.) When asked by defense counsel, Martell reported he was unaware who, if anyone, "won" the fight between the suspect and the victim. (*Id.* at 18–19.)

After the fight, the victim stated that he picked up a set of car keys that he thought were his, but in fact belonged to the suspect who had driven away. (*Id.* at 11.) The victim reported several scrapes and bruises, which Martell documented. (*Id.* at 14–15.)

### B.     Alleyway Stop and Victim Show-Up Procedure

While Martell was at the gas station, fellow St. Paul Police Officer Benjamin Slater was also responding to the radio call about the fight. (*Id.* at 30–31.)[5] While en route to the gas station, Slater heard Martell say over the radio that a suspect involved in the fight had left the area in a silver two-door Dodge Challenger traveling eastbound on Maryland Avenue. (*Id.*) Another officer from St. Paul's Gang Unit informed Slater over the radio

---

[5]     Slater's body camera was active and recording during all relevant parts of his involvement. (*See* Tr. [Doc. No. 39] at 44-45; Slater Body Camera Footage [Gov't Ex. 4].)

that he knew a man named Draveetray Williams who was "known to drive a two-door Dodge Challenger and . . . carry weapons." (*Id.* at 31.) That same Gang Unit officer also informed Slater that Williams had "silver-grilled" (i.e., metallic) teeth. (*Id.* at 32.)

Slater searched for a vehicle matching the silver Dodge Challenger description for about 25 to 30 minutes, but did not find it. (*Id.* at 32–33.) While on his way to the gas station, however, Slater noticed a silver two-door vehicle stuck in the snow at the end of an alleyway attempting to get out onto Maryland Avenue. (*Id.* at 33.) The alleyway is right next to the gas station where the fight occurred, but cannot be seen from the gas station due to a privacy fence. (*Id.*)

Slater pulled up behind the silver vehicle and activated his squad car's emergency lights.[6] (*Id.* at 34–35.) After approaching the vehicle on foot, Slater spoke with the driver—who he identified as Draveetray Williams, the Defendant—through the driver's side window. (*Id.* at 35–36.) Williams told Slater that he could not turn off his vehicle because he had lost his keys. (*Id.* at 37.) While speaking with Williams, Slater observed that Williams' left hand was cut open and bloody. (*Id.* at 37–38.) Slater also noticed that there was a distinct odor of what he identified as marijuana coming from the vehicle. (*Id.*; Slater Body Camera Footage [Gov't Ex. 4] at 18:25–18:35.) Slater then contacted Martell to notify him that a vehicle matching the description he had sent out earlier had been stopped, and the driver had blood on his knuckles. (Tr. [Doc. No. 39] at 11–12.) He requested a description of the suspect from Martell, as well as a brief summary of what had

_____

[6]     Slater's squad car cameras activated when he turned on his vehicle's emergency lights. (*See* Tr. [Doc. No. 39] at 44–45; Slater Dash Camera Footage [Gov't Ex. 5].)

happened at the gas station. (*Id*. at 12, 39.) Martell told Slater the suspect was a black male, 6'2" to 6'3", 160 to 170 pounds, wearing a gray sweatshirt and gray sweatpants, and had silver teeth. (*Id*. at 12, 39; Martell Body Camera Footage [Gov't Ex. 3] at 37:00–37:40.) Martell also informed Slater that there was likely a firearm in the silver Challenger. (Martell Body Camera Footage [Gov't Ex. 3] at 37:40–38:05.) Williams matched the description provided by Martell—including the metal teeth and bloody knuckles—so Slater requested additional police officers to his location. (Tr. [Doc. No. 39] at 39.) When backup arrived, Slater had Williams exit his vehicle, and detained him in his squad car.[7] (Tr. [Doc. No. 39] at 39–40.)

After Williams was removed from the vehicle and detained, several other officers who had arrived to provide support to Slater can be heard discussing the smell of marijuana emanating from the vehicle. (Slater Body Camera Footage [Gov't Ex. 4] at 14:52–15:15.) One officer noted that he could see what appeared to be marijuana under the front seat; at that point, Slater and the other officers decided that they were going to search the vehicle. (*Id*. at 18:30–18:40.)

Slater then requested a "show-up" procedure, where the victim would be brought to the location of the possible suspect for identification purposes. (Tr. [Doc. No. 39] at 13.) During the procedure, the victim remains in a squad car while the suspect is placed where the victim can see the suspect. (Tr. [Doc. No. 39] at 13.) Before bringing the victim to the alleyway, Martell spoke with the victim, telling him that he was going to bring him to a

---

[7]     Slater never said anything to Martell about the odor of marijuana he thought was coming from Williams' vehicle. (Tr. [Doc. No. 39] at 20.)

location where an individual had been stopped and that the person might be the individual who assaulted him. (*Id.* at 13–14.) After driving the victim to the alleyway where Williams was being detained, but before the show-up procedure occurred, Martell told the victim that "this may or may not be the guy" who had assaulted him, and all he wanted was a "yes" or a "no." (Martell Body Camera Footage [Gov't Ex. 3] at 46:50–47:22.)

Meanwhile, Slater informed Williams that he was being detained for a "show-up"[8] procedure related to a fight. (Tr. [Doc. No. 39] at 40–41.) Williams then admitted to Slater that he had been in a fight. (Slater Dash Camera Footage [Gov't Ex. 5] at 7:05:50–7:06:05 p.m.) Slater told the magistrate judge, when asked, that he could not remember if he or Williams mentioned a gas station at the time Williams admitted to being in a fight. (Tr. [Doc. No. 39] at 41, 66.) Williams' explanations of the fight while sitting in the back of Slater's squad car, however, are consistent with the victim's description of the fight, albeit cast in a more favorable light to Williams. (*See generally* Slater Dash Camera Footage [Gov't Ex. 5] at 7:05—7:07 p.m.) Around that time, Martell arrived with the victim, so Slater removed Williams from his squad car, walked him down the alleyway away from the silver Challenger, stopped in front of Martell's patrol car, and had Williams alternate between looking directly at, and facing to either side of, Martell's squad car. (Tr. [Doc. No. 39] at 13; Slater Body Camera Footage [Gov't Ex. 4] at 19:55–20:50.) The victim identified Williams as the man who had assaulted him and brandished a handgun. (Tr. [Doc. No. 39] at 13–14, 41; Martell Body Camera Footage [Gov't Ex. 3] at 48:50–49:30.)

---

[8]     Slater used the term "line up" when speaking to Williams. (Slater Body Camera Footage [Gov't Ex. 4] at 15:40–15:55.)

## C.    Search of Williams' Vehicle

While the "show-up" procedure was happening, police officers began to search Williams' vehicle. (Tr. [Doc. No. 39] at 42–43.) Slater testified that officers were conducting the search to look for both drugs and any firearms that may be present. (*Id.* at 43; Slater Body Camera Footage [Gov't Ex. 4] at 23:00–24:30 (noting that officers were searching the car "for the firearm" and for any drugs).) Inside the engine compartment, officers found two plastic bags containing a green, leafy substance that Slater suspected was marijuana. (*Id.*; Slater Body Camera Footage [Gov't Ex. 4] at 28:50–33:00.) It was later confirmed to be about a pound of marijuana.[9] (Tr. [Doc. No. 39] at 43.)

On the body camera footage, Slater can be heard communicating with an officer from the Gang Unit, during which he learns that the police had, at some point in the past, searched the silver Dodge Challenger for firearms but were unable to find Williams' "hide spot," if any existed. (Slater Body Camera Footage [Gov't Ex. 4] at 26:23–27:15.) Slater and another officer discussed where in the vehicle a firearm may be hidden. (*Id.*) Later, while searching the interior of the vehicle, Slater discovered a concealed compartment in the driver-side door, underneath the window and door-lock control panel. (Tr. [Doc. No. 39] at 43; Slater Body Camera Footage [Gov't Ex. 4] at 38:50–39:15.) To access the compartment, Slater used his knife to "pop [] up" the control panel; in doing so, he did not cut or damage the vehicle in any way. (Tr. [Doc. No. 39] at 52, 61–62.) Inside the

---

[9]    At some point during the search, another officer attached to the St. Paul Gang Unit offered to obtain a warrant so the silver vehicle could be towed and searched elsewhere. (Tr. [Doc. No. 39] at 47–48.) No warrant was obtained.

compartment was a pistol, a small amount of what Slater suspected was marijuana, and a digital scale. (*Id.* at 43–44; Slater Body Camera Footage [Gov't Ex. 4] at 45:00–50:00.) The pistol's magazine was loaded, but there was no ammunition in the chamber of the firearm. (Tr. [Doc. No. 39] at 44.) Slater testified that he decided to check the panel due to "past discussions with officers about weapon hiding spots" but that nothing about this incident led him to suspect a weapon was concealed in the door.[10] (*Id.* at 52–53, 65 (admitting he had no particularized suspicion as to the compartment).)

While Slater was not certain exactly how long the search of Williams' vehicle lasted, he testified that it lasted approximately 30 minutes. (*Id.* at 63.) In any event, he was confident it did not take hours to finish the search. (*Id.*)

## II.    DISCUSSION

The Court must undertake an independent, de novo review of those portions of the R&R to which a party objects and "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1) (2012); *see also* D. Minn. L.R. 72.2(b)(3).

The magistrate judge recommended that Williams' motion to suppress evidence obtained from the warrantless search of his vehicle be denied in its entirety. (R&R [Doc. No. 43] at 18.) Williams objects to three portions of that recommendation: (1) Section IIA,

---

[10]    At the evidentiary hearing, Slater was asked if he described his decision to search the compartment as a "Hail Mary." (Tr. [Doc. No. 39] at 56.) He disputes using the term, but admits that if he did say it, he was "taking a guess on an area to search." (*Id.*) Slater can be heard using the term on his body camera footage. He states, when speaking with another officer about finding the gun: "Final spot. Hail Mary." (Slater Body Camera Footage [Gov't Ex. 4] at 55:00–55:25.)

which concludes that officers had sufficient probable cause to search Williams' vehicle based in part on the sufficiency of the description of Williams and his vehicle that Martell passed along over the radio; (2) Section IIB, which concludes that officers had sufficient probable cause to search Williams' vehicle because the description of the alleged crime, coupled with other facts, established that evidence of a crime could be in Williams' car; and (3) Section III, which concludes that the scope of the search of Williams' vehicle was constitutionally sufficient with respect to the compartment where the firearm was found. (*See* R&R [Doc. No. 43] at 10–13, 15–18.)

### A.    The Applicable Law

The Fourth Amendment provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause . . . ." U.S. Const. amend. IV. "Searches conducted without a warrant are per se unreasonable, subject to a few well-established exceptions." *United States v. Hill*, 386 F.3d 855, 858 (8th Cir. 2004) (citation omitted). The government bears the burden of establishing that an exception to the warrant requirement applies. *See Coolidge v. New Hampshire*, 403 US. 443, 455 (1971).

One of the established exceptions to the warrant requirement is the "so-called 'automobile exception,' which authorizes officers to search a vehicle without a warrant if they have probable cause to believe the vehicle contains evidence of criminal activity." *Id.* (citing *United States v. Wells*, 347 F.3d 280, 287 (8th Cir. 2003)); *see United States v. Edwards*, 891 F.3d 708, 712 (8th Cir. 2018) ("Under the automobile exception to the warrant requirement, officers may conduct a warrantless search of a vehicle if they have

probable cause to believe that the car contains contraband or other evidence." (citing *California v. Acevedo*, 500 U.S. 565, 580 (1991))), *cert. denied*, ___ U.S. ___, 139 S. Ct. 349 (2018). The exception exists because a "vehicle's 'ready mobility' creates an exigency and because individuals have a 'reduced expectation of privacy in an automobile, owing to its pervasive regulation.' " *United States v. Dunn*, 928 F.3d 688, 693 (8th Cir. 2019) (quoting *Pennsylvania v. Labron*, 518 U.S. 938, 940 (1996) (per curiam)).

Probable cause exists "when, considering all the circumstances, there is a fair probability that evidence of a crime will be found in a particular place." *United States v. Lopez-Zuniga*, 909 F.3d 906, 909 (8th Cir. 2018) (citing *United States v. Faulkner*, 826 F.3d 1139, 1144 (8th Cir. 2016)); *see also Florida v. Harris*, 568 U.S. 237, 243 (2013) (same); *United States v. Murillo-Salgado*, 854 F.3d 407, 418 (8th Cir. 2017) (same). Because " '[p]robable cause is a fluid concept that focuses on the factual and practical considerations of everyday life on which reasonable and prudent [persons], not legal technicians, act,' " *Lopez-Zuniga*, 909 F.3d at 909 (quoting *United States v. Colbert*, 605 F.3d 573, 576 (8th Cir. 2010)), the Court reviews whether probable cause to detain and search Williams' vehicle was present in this case through "a common sense approach, not a hypertechnical one," *id.* (citation omitted). Indeed, " 'probable cause may be based on the collective knowledge of all law enforcement officers involved in an investigation and need not be based solely upon the information within the knowledge of the officer on the scene if there is some degree of communication.' " *Edwards*, 891 F.3d at 711–12 (quoting *United States v. Horne*, 4 F.3d 579, 585 (8th Cir. 1993)).

**B.    The Description Of The Suspect, Suspect's Vehicle, And The Alleged Crime Were Sufficient To Detain Williams And Search His Automobile**

Williams objects to Section IIA and IIB of the R&R, arguing that the magistrate judge erroneously concluded that the "inaccurate description of Williams, his vehicle, and the alleged crime were sufficient to detain and search." (Williams Mem. in Support of Obj. [Doc. No. 45] ("Williams Mem.") at 6.)  With respect to the police description of the suspect's vehicle and the suspect himself, Williams asserts that the description aired by police over the radio does not match Williams' vehicle because police were searching for "a silver four-door Charger sedan, not a grey two-door Challenger coupe," and that Williams is not the right person because "Williams' attire was described in[]accurately," although he does not explain how the police description was inaccurate. (Williams Mem. [Doc. No. 45] at 9–10.)  With respect to the description of the alleged crime, Williams contends the victim described Williams as "displaying a handgun, but then placing it safely in his car" after which the two men voluntarily engaged in a fist fight. (*Id.* at 7.)  He also asserts that his alleged use of phrases like "Get back in the car before I start shooting," and "I'll take your life," are contingent threats that do not place a reasonable person in immediate fear of great bodily harm. (*Id.* at 8.)  To that end, he argues, the description of the altercation does not constitute a crime and therefore the police lacked probable cause to search his vehicle. (*Id.* at 7, 9.)

The Court disagrees.  First, with respect to the description of the suspect's vehicle, the body camera footage and testimony of Officers Martell and Slater clearly establish that the suspect's vehicle was consistently described as a silver two-door Dodge Challenger.

12

(*See* Tr. [Doc. No. 39] at 7–8 (Martell), 30–31 (Slater); Martell Body Camera Footage [Gov't Ex. 3] at 24:45–25:22; Slater Body Camera Footage [Gov't Ex. 4] at 9:50–10:20; *see also supra* at n.2 (explaining the discrepancy between Martell's testimony and his body camera footage).) Based on Slater's dash camera and body camera footage, it appears to the Court that Williams was in fact driving a silver or gray Dodge Challenger when Slater found him stuck in the alleyway. (*See* Slater Dash Camera Footage [Gov't Ex. 5] at 7:00 p.m.; Slater Body Camera Footage [Gov't Ex. 4] at 00:30–00:45.) Further supporting the positive identification of the silver Challenger is the fact that Williams admitted he could not turn off the vehicle because he did not have his keys, which is consistent with the victim having accidentally taken Williams' keys after the fistfight. (*See* Tr. [Doc. No. 39] at 11.) To the extent there are a few inconsistencies in the description of the vehicle, the Court agrees with the magistrate judge that they are immaterial because the vehicle generally matched the description provided by the victim and was found in the vicinity of, and close in time to, the location and occurrence of the crime. *See United States v. Magness*, 69 F.3d 872, 874 (8th Cir. 1995) (affirming conclusion that officers had probable cause where defendant's white, older-model Firebird was found near crime scene and matched witness description of "white, older-model sports car").

With respect to the description of the suspect himself, the record establishes that the suspect was consistently described as a black male, 6'2" to 6'3", 160 to 170 pounds, wearing a gray sweatshirt and gray sweatpants, with silver teeth. (*See* Tr. [Doc. No. 39] at 12 (Martell describing suspect over radio), 39 (Slater confirming description of suspect from Martell); *see also* Martell Body Camera Footage [Gov't Ex. 3] at 29:40–37:00 (victim

described suspect as wearing a Nike brand track suit of sorts, but eventually stated that he was wearing gray sweatpants and a gray sweatshirt). Slater testified that Williams matched this description. (Tr. [Doc. No. 39] at 39.) Moreover, based on Slater's body camera footage, the Court finds that Williams (1) was wearing a dark-colored sweatshirt and sweatpants, (2) matched the general physical characteristics of the suspect's description, and (3) and has silver teeth. (*See* Slater Body Camera Footage [Gov't Ex. 4] at 2:10–2:18 (initial discussion through driver-side window), 13:00–15:30 (removing Williams from the vehicle).) Williams also had bloody knuckles, consistent with having just left a fight. (Tr. [Doc. No. 39] at 37–38.)

The only person who varied at all from this description was the victim's wife, who described Williams' clothing *more* accurately, stating that the suspect was wearing a dark green sport outfit, "like a 'Jordan' or 'Adidas' or something like that." (Martell Body Camera Footage [Gov't Ex. 3] at 1:18:00–1:18:35.) On Slater's body camera and dash camera footage, Williams shirt prominently displays a white "Nike" logo on the front of his sweatshirt, and the rest of the fabric was a mix of either black, gray, or dark green with various white stripes or panels. (Slater Body Camera Footage [Gov't Ex. 4] at 2:10–2:18, 13:00–15:30; Slater Dash Camera Footage [Gov't Ex. 5] at 7:02:20–7:04:20.)

Other facts also indicate that the totality of the circumstances provided Slater with sufficient probable cause as to the identity of the suspect. Williams was found in a vehicle matching the description given by the victim, (*see supra* at 12–13), in an alleyway right next to the gas station where the assault occurred, (*see* Tr. [Doc. No. 39] at 33), less than an hour after the crime happened, (*see id.* at 32–33 (noting that Slater found Williams after

approximately 25 to 30 minutes of searching).)  In addition to the fact that Williams generally matched the description of the suspect, this evidence provided Slater with ample probable cause to conclude that Williams was the suspect.  *See United States v. Perry*, 908 F.3d 1126, 1129 (8th Cir. 2018) (holding that description of a suspect was close enough to defendant's appearance that, when combined with other evidence such as when the defendant was found, "a reasonable officer could have concluded that [defendant] was the" perpetrator); *see also United States v. Jone*s, 535 F.3d 886, 890 (8th Cir. 2008) (holding that probable cause to arrest defendant was present where defendant fit general description of suspect's height, race, clothing, and physical build, and the defendant was found less than a mile from the scene of the crime only thirty minutes after the crime was completed).[11]

Finally, with respect to the description of the crime, witness and victim statements given to the police provided more than enough information to establish that a crime likely occurred, and that evidence of the crime would likely be found in the suspect's vehicle. Police were told that a suspect matching Williams' appearance—and driving a vehicle essentially identical to Williams' vehicle—had been in a fight at a gas station, and that just before that fight, the suspect had pulled out a firearm, racked the slide on the firearm as though he was loading it, and threatened to kill the victim if he did not get back in his car.

---

[11]     Even if Slater was mistaken in his identification of Williams as the suspect, the Supreme Court has recognized that "searches and seizures based on mistakes of fact can be reasonable." *Heien v. North Carolina*, 135 S. Ct. 530, 536 (2014).  To that end, "if officers with probable cause to arrest a suspect mistakenly arrest an individual matching the suspect's description, neither the seizure nor an accompanying search of the arrestee would be unlawful." *Id.* (citing *Hill v. California*, 401 U.S. 797, 802–805 (1971)).

(Tr. [Doc. No. 39] at 10.)  The victim also told police that the firearm that was used to threaten him was thrown by the suspect into the silver Dodge Challenger just before the victim and the suspect began to fight.  (*Id.*)  That same vehicle was then driven away by the suspect after the fight.  (*Id.* at 7.)  By itself, that description provided probable cause that some degree of assault likely occurred, *see, e.g.*, Minn. Stat. §§ 609.221, subd. 1 (assault in the first degree), 609.222, subd. 1 (assault in the second degree), 609.223 (assault in the third degree), 609.224 (assault in the fifth degree) (2018), in addition to some form of terroristic threat or threat of violence, *see* Minn. Stat. § 609.713, subd. 1 (2018).  It also provided probable cause that a firearm was inside the silver Dodge Challenger.

Williams contends that even if he displayed a firearm, the words he spoke to the victim were "contingent threats" that would not place a victim in immediate fear of great bodily harm, and that the facts show that he and the victim "consented" to a voluntary fist fight.  (Williams Mem. [Doc. No. 45] at 8.)  None of these contentions have merit.

First, Williams' statements to the victim constituted threats.  Minnesota law states that a threat is a " 'declaration of an intention to injure another or his property by some unlawful act.' "  *State v. Olson*, 887 N.W.2d 692, 698 (Minn. Ct. App. 2016) (quoting *State v. Schweppe*, 237 N.W.2d 609, 613 (Minn. 1975)).  A threat can consist of words or actions, but whether it constitutes a threat " 'turns on whether the communication in its context' " would reasonably create apprehension that " 'its originator will act according to its tenor.' " *Id.* (quoting *Schweppe*, 237 N.W.2d at 613) (citing *State v. Franks*, 765 N.W.2d 68, 75 (Minn. 2009)).  Indeed, in *State v. Bjergum*, the only case cited by Williams in support of his "contextual threat" argument, the Minnesota Court of Appeals held that "declaring the

intent to injure by an unlawful act constitutes a terroristic threat when the person who utters the statement recklessly disregards the risk of terrorizing another." 771 N.W.2d 53, 57 (Minn. Ct. App. 2009), *rev. denied* (Minn. Nov. 17, 2009).

Here, Williams and the victim were exchanging heated words, at which point Williams brandished a firearm, loaded it (or, at the very least, appeared to do so), and told the victim that he would "take [his] life." (Tr. [Doc. No. 39] at 10.) The only reasonable interpretation of such a statement, in that context, is that Williams was threatening the victim. Moreover, even if Williams had not said anything, the act of brandishing and making a show of loading a firearm while arguing constitutes a threat on its own. *See State v. Essex*, 838 N.W.2d 805, 810 (Minn. Ct. App. 2013) ("If appellant had pointed *or brandished* the firearm, he may have been charged with and convicted of second-degree assault, rather than *attempted* second-degree assault." (first emphasis added) (second emphasis in original)), *rev. denied*, (Minn. Jan. 21, 2014); *State v. Kastner*, 429 N.W.2d 274, 275 (Minn. Ct. App. 1988) ("The fact that [defendant] did not hold the objects in a throwing position is of no consequence . . . [because] to be imminently dangerous . . . the threat to use [] an instrumentality and the ability to use it immediately constitutes imminency." (citations omitted) (internal quotation marks omitted)), *rev. denied*, (Minn. Nov. 16, 1988); *State v. Patton*, 414 N.W.2d 572, 574 (Minn. Ct. App. 1987) (concluding that brandishing a knife and assuming "attack position," without actually swinging or attempting to use the knife, was sufficient to cause fear in another of immediate bodily harm). Under the circumstances, this Court finds that Williams' statements were threats because, "in [] context . . . [the statement created] apprehension that [Williams would] act

according to its tenor." *Olson*, 887 N.W.2d at 698 (citation omitted) (internal quotation marks omitted).

Second, there is no evidence in the record illustrating that the victim "consented" to a fist fight with Williams. In fact, the evidence suggests that the victim was attempting to resolve a door-ding situation with another gas station customer when Williams inserted himself into the situation and escalated the conflict by brandishing a firearm. (*See* Tr. [Doc. No. 39] at 10 (noting that the victim and another individual were talking when Williams intervened); *see also* Martell Body Camera Footage [Gov't Ex. 3] at 1:17:00–1:17:40 (statement from victim's wife in which she notes that the person who had hit her door was apologizing when Williams suddenly "started talking s——" (expletive omitted)).)

Ultimately, the Court finds that the description of the suspect, suspect's vehicle, and crime were sufficient to provide probable cause to Slater to detain and search Williams and his vehicle for a firearm. Moreover, once Slater (and other officers) noticed the odor of marijuana coming from Williams' vehicle, they also had probable cause to search for narcotics.

### C.    The Warrantless Search Of Williams' Automobile Was Proper.

Finally, Williams objects to Section III of the magistrate judge's R&R, which concluded that the police did not exceed the scope of the warrantless search of Williams' vehicle. (R&R [Doc. No. 43] at 15–17.) He asserts that the police exceeded the scope of their warrantless search of Williams' vehicle because they lacked a "particularized suspicion" that something was concealed under the window and door-lock control panel in the driver-side door. (Williams Mem. [Doc. No. 45] at 10–11.) In support of his argument,

Williams cites *Ornelas v. United States*, 517 U.S. 690 (1996), and *United States v. Lopez*, 777 F.2d 543 (10th Cir. 1985), for the proposition that a "particularized suspicion" about the particular compartment was required before police could search it. (Williams Mem. [Doc. No. 45] at 11.)

The Court disagrees. Neither *Ornelas* nor *Lopez* support Williams' assertion that "particularized suspicion" is required to search a particular area in a vehicle *after* probable cause to search a vehicle in its entirety has already been established. As an initial matter, *Ornelas* dealt with the appropriate standard of review an appellate court should use when reviewing determinations of probable cause and reasonable suspicion, not the scope of warrantless searches based on probable cause. 517 U.S. at 695. To the extent the Supreme Court mentioned probable cause at all, its discussion focused on what is required to establish probable cause to search beyond the scope of a consensual search. *See id.* at 696. The case says nothing about needing probable cause to search in particular areas in a vehicle *after* probable cause to search the vehicle has been established. In fact, the Court noted that police officers "may draw inferences based on [their] own experience in deciding whether probable cause exists" and acknowledged that police may, based on that experience, identify probable cause to search in places a layman would not think to look. *Id.* at 700.

The *Lopez* decision is equally unhelpful to Williams. Aside from being a Tenth Circuit decision which is nonbinding on the Court, *Lopez* also says nothing about requiring a particularized suspicion to search particular areas within a vehicle *after* probable cause to search the vehicle has been established. Much like *Ornelas*, *Lopez* dealt with whether

probable cause existed to seize and search a vehicle where the search went beyond the scope of a consensual search, and the vehicle had already been stopped at a roadblock. 777 F.2d at 546, 550–51. In concluding that officers had probable cause, the *Lopez* court stated that an expanded search into a compartment behind a vehicle's speakers was constitutional when, during the consensual search, officers detected strong ether-like odors and found evidence that the vehicle's speakers had been removed and reattached. *Id.* at 551.

Unlike *Ornelas* and *Lopez*, this case deals with whether probable cause to search the vehicle existed independent of any consent to search.[12] The law related to warrantless searches of vehicles based on probable cause in that context is well-settled. Where police have probable cause to believe an individual has committed a crime and that evidence of that crime is present in his vehicle, they may search the vehicle *in its entirety*. *Coolidge*, 403 US. at 455 (citation omitted). Indeed, "[i]f probable cause justifies the search of a lawfully stopped vehicle, it justifies the search of *every part of the vehicle and its contents* that may conceal the object of the search." *United States v. Ross*, 456 U.S. 798, 825 (1982) (emphasis added); *see United States v. Caves*, 890 F.2d 87, 90 (8th Cir. 1989) ("The scope of this [a] warrantless search [of an automobile] may be as extensive as that of a search authorized by a warrant supported by probable cause and 'particularly describing the place to be searched.' " (quoting *Ross*, 456 U.S. at 800)). Of particular importance here, the

---

[12]     The United States argued in its response to Williams' Objections that the search of Williams' vehicle here was permissible as either a protective sweep of a vehicle, *see United States v. Stewart*, 631 F.3d 453, 456–57 (8th Cir. 2011), or under the automobile exception. (*See* United States Mem. [Doc. No. 46] at 6.) Because the Court holds that the search was authorized under the automobile exception, it does not reach the question of whether this was a permissible protective sweep of a vehicle.

Supreme Court has held that "[w]here there is probable cause to search for contraband in a car, it is reasonable for police officers . . . to examine packages and containers *without a showing of individualized probable cause* for each one." *Wyoming v. Houghton*, 526 U.S. 295, 302 (1999). To that end, "the driver's belongings or containers attached to the car . . . are 'in' the car, and the officer has probable cause to search for contraband *in* the car." *Id.* (emphasis in original).

The Court has already concluded that the police had probable cause to search Williams' vehicle for firearms and narcotics. As such, police were authorized to search the *entirety* of Williams' vehicle, including any containers or compartments within the vehicle, for said contraband so long as the locations in which they were searching *could* contain the contraband that was the object of their search. *See Houghton*, 526 U.S. at 302; *Ross*, 546 U.S. at 800. The compartment under the control panel was certainly large enough to contain a firearm;[13] in fact, in the present case, it held a firearm, a bag containing what appeared to be marijuana, and a digital scale. (Tr. [Doc. No. 39] at 44.) Moreover, Slater explained that "past discussions with officers about weapon hiding spots" led him to the control panel, (*id.* at 52), which constitutes a reasonable inference based on his law enforcement training and experience, *see Caves*, 890 F.2d at 90 (noting that "trained officer[s] draw[] inferences and make[] deductions . . . that might well elude an untrained person, and evidence collected must be seen and weighed not in terms of library analysis

---

[13] At least one court has acknowledged the existence of a hiding spot underneath the window and door lock control panel. *See State v. Miramontes*, No. 1 CA-CR 06-0406, 2007 WL 5249030, at *2 (Ariz. Ct. App. Dec. 4, 2007) ("The window-control and door-lock panel had been pushed aside, and the gun was underneath that panel.").

by scholars, but as understood by those versed in the field of law enforcement" (citation omitted) (internal quotation marks omitted)); *see also Edwards*, 891 F.3d at 711–12 (noting that "probable cause may be based on the collective knowledge of all law enforcement officers involved in an investigation and need not be solely based upon the information within the knowledge of the officer on the scene if there is some degree of communication" (citation omitted)). Under such circumstances, the police did not exceed the scope of the warrantless search of Williams' automobile by searching under the window and door-lock control panel.

The Court must address one final point. It appears to the Court that Williams is arguing that because Slater had to use some degree of force to access the hidden panel in Williams' door, Slater impermissibly engaged in a "destructive" search that falls outside the normal scope of a warrantless search. (*See* Williams Mem. [Doc. No. 45] at 10–11 (noting that the window-control panel in Williams' vehicle was "not loose" and was "snapped in place").) To the extent Williams is making this argument, it is without merit.

As an initial matter, the Court does not consider the manner in which Slater discovered the hidden compartment under the window and door-lock control panel to be a "destructive" search. While Slater did need to use his knife to open the panel, he testified that all he had to do was "poke[] under [the panel] to pop it up." (Tr. [Doc. No. 39] at 52.) He did not have to cut into the vehicle in any way, nor did he cause any permanent damage to the door or the control panel. (*Id.* at 62.) The panel was not bolted or screwed into place, and nothing in the record indicates that the panel could not be restored to exactly the same condition as it was before Slater popped it open. Indeed, Williams even

acknowledges that the panels were held in place by a "clip-in or clamp design" that would require a tool to pry open. (Williams Mem. [Doc. No. 45] at 11.) Therefore, Slater's search was not destructive. *Cf. United States v. Anguiano*, No. 4:13-CR-00062 (SMR/CFB), 2013 WL 11311235, at *7 (S.D. Iowa Oct. 24, 2013) (concluding that removal of a panel during a search was not destructive where the "panels at issue snapped on and off, and were designed to do so").

Even if the search was "destructive," Slater needed no particularized suspicion to search under the panel at the time that he did because he already had probable cause to search the entire vehicle. The Eighth Circuit has noted that "destructive" searches require more particularized probable cause than non-destructive searches, but only where the destructive search occurs after police discover evidence within a vehicle while conducting an initial, *consensual* search. *See United States v. Zamora-Garcia*, 831 F.3d 979, 983 (8th Cir. 2016) ("[G]eneral consent to a search does not give law enforcement officers license to destroy property . . . [c]utting or destroying an object during a search requires either explicit consent . . . or articulable suspicion that supports a finding that probable cause exists to do the destructive search." (citation omitted) (internal quotation marks omitted)); *Murillo-Salgado*, 854 F.3d at 417–18 ("Observations made by an officer during a consensual search of a vehicle may provide the officer with probable cause to expand the scope of the search under the automobile exception."); *United States v. Guevara*, 731 F.3d 824, 831 (8th Cir. 2013) (noting that discovering a hidden compartment in a vehicle during a consensual search provided probable cause for a destructive search outside the scope of that initial consent). This case does not involve a consensual search of a vehicle. Rather,

the police searched Williams' vehicle—and the compartment under the window and door-lock panel—based on probable cause stemming from reports that he was the aggressor in an assault, and that his vehicle contained a firearm that he brandished during that assault. No particularized suspicion was necessary to search the compartment because police had probable cause to search the entire vehicle, even in a destructive manner.

## III. CONCLUSION

Based on the submission and the entire file and proceedings herein, **IT IS HEREBY ORDERED THAT:**

1. Defendant's Objections [Doc. No. 44] to the August 5, 2019 Report and Recommendation [Doc. No. 43] are **OVERRULED**;

2. The August 5, 2019 Report and Recommendation [Doc. No. 43] is **AFFIRMED** and **ADOPTED**, and Defendant Draveetray Lyrell Williams' Motion to Suppress Evidence Obtained as a Result of Search and Seizure [Doc. No. 22] is **DENIED**.


Dated: September 20, 2019                    s/Susan Richard Nelson
                                             SUSAN RICHARD NELSON
                                             United States District Judge