# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| United States of America, | Case No. 19-cr-84 (SRN/DTS) |
| Plaintiff, | |
| v. | **ORDER** |
| Draveetray Lyrell Williams, | |
| Defendant. | |

Nathan Hoye Nelson, United States Attorney's Office, 600 U.S. Courthouse, 300 S. 4th St., Minneapolis, MN 55415, for the Government

Andrew M. Irlbeck, Andrew Irlbeck, Lawyer, Chartered, 332 Minnesota St., Ste. W1610, St. Paul, MN 55105, for Defendant

SUSAN RICHARD NELSON, United States District Judge

This matter is before the Court on Defendant Draveetray Lyrell Williams' Motion for Reconsideration of Detention and for Temporary Release ("Motion for Release") [Doc. No. 77].   The Government filed a response in opposition to the Motion for Release. (Gov't's Opp'n [Doc. No. 83]), and Williams filed a Reply [Doc. No. 87].   Based on a review of the file, record, and proceedings herein, and for the following reasons, the Court denies the Motion for Release.

## I.     BACKGROUND

### A.  Procedural and Factual Background

On March 20, 2019, the Government charged Williams with being a felon in possession of a firearm.  (Indictment [Doc. No. 7].)  After his arrest and preliminary detention, (*see* Mar. 19, 2019 Minutes [Doc. No. 4]; Order of Prelim. Detention [Doc. No. 5]), Magistrate Judge Katherine Menendez ordered him to be detained.  (Mar. 21, 2019 Minutes [Doc. No. 11]; Order of Detention [Doc. No. 15].)

In the Order of Detention, the magistrate judge found that while Williams did not present a risk of flight, there was no combination of conditions that would reasonably assure the safety of the community if he were released.  (Order of Detention at 1–2.) Magistrate Judge Menendez noted in particular that in the preceding 18 months, Williams had "demonstrated a relentless pattern of criminal conduct and contact with law enforcement."  (*Id.* at 2.)  Since September 2017, Williams had been arrested twice and convicted of 5th Degree Controlled Substance crimes based on his possession of over 375 and 80 grams of marijuana, respectively.  (*Id.*)  Further, the magistrate judge noted that while Williams was on pretrial release or probation for the controlled substance crimes, he pleaded guilty to 5th Degree Assault, and accumulated three arrests related to alleged domestic assaults,

> including an August 2018 arrest for domestic assault (for which the charges were dismissed), an October 2018 arrest for felony domestic assault (charges pending), and a January 2019 arrest for felony violation of a no-contact order (charges pending).  He also incurred misdemeanor convictions for possessing or selling small amounts of marijuana, and having marijuana in a motor vehicle.  Moreover, the present Indictment involves allegations that Mr. Williams possessed a firearm and a full pound of

2

> marijuana while on probation from his previous controlled substance
> convictions, and within less than two months of posting bond on the two
> serious felony domestic assault and no-contact violation charges
> referenced above.

(*Id.*) Magistrate Judge Menendez concluded that even when Williams is under supervision, he is unable to abide by the law, leaving the Court "unable to craft conditions of supervision that allay the significant resulting danger to the community." (*Id.*)

In December 2019, the Government filed a felony Information against Williams, charging him with being a felon in possession of a firearm. (Information [Doc. No. 56].) On December 16, 2019, pursuant to a plea agreement, (the "Plea Agreement"), Defendant pleaded guilty to the charge. (Dec. 16, 2019 Minutes [Doc. No. 58].) In the Plea Agreement, Williams admitted to the factual basis for the offense, namely, that on February 15, 2019, he knowingly possessed a Jimenez pistol, which was manufactured outside the State of Minnesota, as well as one pound of marijuana and a digital scale. (Plea Agmt. [Doc. No. 57] ¶ 2.) Williams agreed that when he possessed the firearm, he knew that he had been convicted of at least one crime punishable by imprisonment for a term exceeding one year. (*Id.*) In fact, Williams acknowledged convictions for six such crimes: 2d Degree Assault, Aiding & Abetting an Offender, Unlawful Possession of a Pistol, Aiding & Abetting Terroristic Threats, and two counts of 5th Degree Controlled Substance Crime. (*Id.*)

In the Presentence Investigation Report, ("PSR"), U.S. Probation and Pretrial Services calculated a total offense level of 21, with a criminal history category of VI, resulting in a Guidelines range of 77 to 96 months. (PSR [Doc. No. 69] ¶¶ 33, 53, 86.)

U.S. Probation and Pretrial Services advise the Court that a warrant against Williams is active in Hennepin County, due to the alleged violations of a no-contact order. The warrant was issued due to Williams' failure to appear in court while in federal custody. In addition, an active no-contact order remains in place until March 26, 2021, prohibiting Williams from having contact with the mother of his child.

In addition, U.S. Probation and Pretrial Services reports that Williams incurred a major disciplinary infraction on March 28, 2020, while in detention at the Sherburne County Jail ("the Jail"). Williams made threatening comments to a deputy sheriff, yelled, swore, hit and kicked his cell door, and broke his cell window. As punishment, he received 10 days in solitary confinement.

While Williams' sentencing had been scheduled for April 16, 2020, (Dec. 16, 2019 Minutes [Doc. No. 58]), due to the COVID-19 pandemic, the hearing was continued and will be rescheduled. (Mar. 18, 2020 Text-Only Order [Doc. No. 74]; Mar. 17, 2020 D. Minn. Admin Order.)

### B. Parties' Arguments and Evidence

Williams remains in detention in the Jail. Given the COVID-19 pandemic, he seeks temporary release pending sentencing. (Def.'s Mot. at 1.) Williams argues that he is in a high-risk category if he becomes infected with the coronavirus, due to a documented low white blood cell count. (*Id.*; Reply at 2 & Sealed Ex. [Doc. No. 88] to Reply (Oct. 2, 2013 Med. Record); Sealed Supp'l Ex. [Doc. No. 92] (May 8, 2020 Med. Record).) In addition, he contends that the Jail's COVID-19 mitigation measures have inhibited his ability to freely and privately consult with his attorney. (Def.'s Mot. at 1–2.) As to whether he poses

a danger to the community, he asserts that since his detention hearing, the domestic assault charge has been dismissed, and he has been discharged from probation in both Anoka and Ramsey Counties. (*Id.* at 3; Reply at 2–3.) While he acknowledges that a pending no-contact order remains in Hennepin County, he contends that it emanates from the dismissed domestic assault charge in Dakota County. (Def.'s Mot. at 3.) In light of all of these circumstances, Williams asks to reopen the detention hearing pursuant to 18 U.S.C. § 3142(f)(2), and requests home detention, subject to GPS-based location monitoring. (*Id.* at 2.)

The Government opposes Defendant's motion. (Gov't's Opp'n at 1.) It argues that the Jail has effective measures to mitigate the risks posed by COVID-19 and protect inmates' safety. (*Id.* at 4–7.) In addition, it asserts that under the correct statutory provision applicable to a defendant pending sentencing, 18 U.S.C. § 3143, Williams has failed to show that he does not pose a risk of flight or danger to the community. (*Id.* at 7–12.) Furthermore, the Government contends that Williams' arguments regarding the lack of opportunity to privately consult with his counsel are unpersuasive and do not warrant his release. (*Id.* at 13–19.)

In response to Defendant's concerns about COVID-19 and the safety of conditions in the Jail, the Government submits the Affidavit of Brian Frank, dated April 17, 2020 (the "Apr. 17 Frank Aff." [Doc. No. 83-1]). Mr. Frank is the Jail Administrator of the Sherburne County Jail, and supervises the operations of the facility. (Apr. 17 Frank Aff. ¶ 1.) In his affidavit, Frank details the general background, structural safety, operational safety, and medical safety of the Jail, as well as the efforts taken to facilitate inmates' ability to consult

with counsel.   Frank notes that at present, there are no known cases of COVID-19 in the Jail.  (*Id.* ¶ 4.)  In response to inmates' concerns about the pandemic, on April 1 and 2, 2020,  Frank listened to their concerns, and told them about the additional safety measures the Jail has implemented and continues to review as a result of COVID-19.  (*Id.*)

Frank reports that one of the first responsive measures undertaken by the Jail was to reduce the inmate population.  (*Id.* ¶¶ 7–8.)  Jail administrative staff are working with federal agencies, including ICE and the U.S. Marshal's Service, to limit the number of detainees and inmates.  (*Id.*)  On March 16, 2020, the total Jail population (including ICE detainees and inmates) was 606.  (*Id.* ¶ 8.)  As of April 10, 2020, the total Jail population was down to 450.  (*Id.*)

Also, the Jail has implemented additional procedures to monitor the health of incoming inmates before housing them in the general population.  (*Id.* ¶ 9.)  Upon booking, new arrivals are medically screened, which includes the completion of a Coronavirus Screening Checklist.  (*Id.* ¶ 10 & Ex. 1 (Coronavirus Checklist).)  New inmates are then placed in an individual quarantine cell for a 14-day period.  (*Id.* ¶ 10.)  The Jail has designated 24 quarantine cells for new arrivals.  (*Id.*)  While the newly arriving inmates are in quarantine, licensed medical professionals monitor their health for signs or symptoms of illness.  (*Id.*)  If an inmate displays any signs or symptoms of illness, they are seen by a licensed medical professional and treated accordingly.  (*Id.*)

In addition to the Coronavirus Screening Checklist, as part of the screening process, the Jail's medical clinic is able to test inmates for Influenza A and B and for strep throat.  (*Id.* ¶ 11.)  Any new or existing inmate who tests positive for these illnesses is placed in a

medical isolation cell, if directed by medical staff.  (*Id.*)  The Jail also has three negative pressure cells that may be used, in which the air is mechanically ventilated to general negative pressure to prevent contaminated air from escaping.  (*Id.* ¶ 13.)

While the Jail itself lacks the ability to test for COVID-19, if an inmate shows symptoms of the virus, and influenza and strep have been eliminated, Jail administration defers to medical staff regarding whether the inmate should be transported to a hospital or clinic for additional testing.  (*Id.* ¶ 12.)  If testing is unavailable, the Jail will place the inmate in medical isolation or other housing, as directed by medical staff.  (*Id.*)  As of April 17, 2020, only one inmate has been sent for testing, with negative test results.  (*Id.*)  If an inmate is transported for testing and is awaiting test results, the Jail will place the inmate in medical isolation and consult with Jail medical staff and the Minnesota Department of Health ("MDH").  (*Id.* ¶ 14.)

In terms of the Jail's structural safety, Frank states that if necessary, the Jail can isolate into 12 distinct sectors or "smoke zones." (*Id.* ¶ 17.)  To do so, the Jail's nine separate air exchange units can be calibrated to bring in a certain percentage of fresh air, while exhausting the same amount of air from inside the Jail.  (*Id.*)  The return air passes through a MERV-8 filter before entering the Jail.  (*Id.*)  Within a given zone, this ventilation system is able to recycle up to 100% of the air with fresh air, unless cold weather conditions do not permit an exchange at that level.  (*Id.*)  The Jail can control the percentage variable, which is typically set at approximately 20%.  (*Id.*)  In light of COVID-19 safety measures, the Jail has adjusted the value for all zones to 80%.  (*Id.*)  The Jail continues to monitor the

air exchange settings in all zones and will adjust them as necessary, and to the extent feasible under existing conditions. (*Id.*)

As to operational safety, Frank states that the Jail receives regular updates from state and federal agencies and responds accordingly, given the unique environment of a correctional facility. (*Id.* ¶ 5.) The Jail participates in teleconferences hosted by the Minnesota Department of Corrections ("DOC"), where the participants discuss best practices to ensure inmate and staff safety. (*Id.*) Jail administration believes that the measures and procedures it has put in place meet or exceed those of other correctional facilities in Minnesota. (*Id.* ¶ 6.) In response to an inmate complaint, on April 10, 2020, the Inspection and Enforcement Unit of the Minnesota DOC recently reviewed the Jail's increased safety measures and procedures. (*Id.*) The inspector concluded that "[t]he steps taken by Sherburne County Jail Administration exceed the prevention measures being taken in correctional facilities across the state and do not violate any Rule provision." (*Id.*)

Frank also reports that the Jail "has increased its rigorous cleaning, sanitation, and hygiene procedures." (*Id.* ¶ 18.) The Jail cleans all frequently-touched surfaces in housing units four times daily with a virus-killing chemical, and additionally cleans housing units before every meal and the nightly lockdown. (*Id.*) Hallways are cleaned and disinfected three times daily and floors are cleaned once a day. (*Id.*) Soap and water are available to inmates and staff, all of whom are encouraged to wash hands regularly. (*Id.*) In addition, the Jail has retained a contractor to assist in sanitizing touchpoints in the Jail, including housing units. (*Id.* ¶ 19.) The contractor began on April 7, 2020 and will work three times per week. (*Id.*)

With respect to social distancing measures and handwashing standards, the Jail has adopted the following procedures: (1) reducing the number of inmates allowed out of their cells at any given time to half of the population; (2) rotating where inmates will eat on alternate days, with half of the population eating in their cells, and the other half eating in the dayroom, and requiring inmates to pick up and return their own meal trays to eliminate interactions with corrections officers; (3) reducing the number of hours that inmates may be outside of their cells; and (4) posting signs in all housing units with guidance on proper handwashing procedures. (*Id.* ¶ 20.) All of these measures have been undertaken to minimize contact between staff and inmates. (*Id.* ¶ 21.) Jail staff have also consulted with the MDH about social distancing strategies and have followed the agency's recommendation to adopt a conservative approach regarding inmate movement and in-person contact. (*Id.*)

The Jail has also modified delivery systems within housing units to reduce unnecessary person-to-person contact. (*Id.* ¶ 23.) The Jail now utilizes the following procedures: (1) inmates may receive commissary deliveries, but only to individual cells after evening lockdown; (2) inmates may access their legal carts when they are otherwise allowed to be outside their cells; (3) medication delivery for non-dormitory housing units is done in the main hallway of a unit, using a pass-through door, and medical staff who dispense medication have been required to wear a mask and a face shield or goggles since April 5, 2020; and (4) the exchange of clothing is similarly conducted through a pass-through door. (*Id.*)

As to the Jail's staff, Frank states the following procedures have been enacted to limit the chances of contamination or cross-contamination: (1) as of April 6, 2020, Jail staff work 12-hour shifts with seven days on, and seven days off, during which time they may self-quarantine and monitor for any signs of illness; (2) all Jail staff are screened with a body-temperature check and the Coronavirus Screening Checklist every time they arrive at work; (3) the Jail provides electronic briefings to staff at the beginning of shifts, as opposed to face-to-face briefings; (4) during an entire seven-day work period, Jail staff are assigned to only one of three work zones, having a separate entry point for each zone, with the exception of "rovers," or if the need arises to enter a different zone in the event of an emergency; (5) as of April 4–5, 2020, Jail staff are following updated CDC guidelines to wear masks while inmates are out of their cells, and staff are attempting to augment their supply of surgical and N95 masks; and (6) as of April 6, 2020, the Jail received a supply of cotton-style barrier masks, and again, based on guidance from the Minnesota DOC and MDH, staff were instructed to wear the masks when inmates are out of their cells. (*Id.* ¶ 24.)

In addition, regarding the ability of inmates to consult with defense counsel, Frank states that while concerns about COVID-19 have caused the Jail to temporarily discontinue direct contact visits, inmates retain the ability to consult with defense counsel. (*Id.* ¶ 25.) All inmates and counsel may use video visitation in the common areas of the housing unit. (*Id.*) In addition, when approved by the Court, the Jail also facilitates video teleconferencing for inmates to appear for court appearances. (*Id.* ¶ 26.) The Jail also is

committed to facilitating interactions between inmates and defense counsel before, during, and after court appearances.  (*Id.*).

## II.   DISCUSSION

### A.  Motion for Release

While Williams seeks the application of 18 U.S.C. § 3142 to his Motion for Release, (Def.'s Mot. at 1–2; 7–9, 11, 13), that provision applies to pretrial release, not post-conviction release.  Fed. R. Crim. P. 46(a).  Accordingly, Williams' reliance on legal authority involving pretrial release, arising under § 3142(i), is inapplicable.[1]  The release of a defendant pending sentencing is proscribed by 18 U.S.C. § 3143.  Fed. R. Crim. P. 46(c).  Section 3143 provides, in relevant part:

> the judicial officer shall order that a person who has been found guilty of an offense and who is awaiting imposition or execution of sentence . . . be detained, unless the judicial officer finds by clear and convincing evidence that the person is not likely to flee or pose a danger to the safety of any other person or the community if released.

18 U.S.C. § 3143(a)(1).  As to a motion for release made by a defendant who is pending sentencing, "[t]he burden of establishing that the defendant will not flee or pose a danger to any other person or to the community rests with the defendant."  Fed. R. Crim. P. 46(c).

---

[1]     The cases which Defendant cites involve pretrial defendants, not defendants who are awaiting sentencing.  (See Def.'s Mot. at 8) (citing *United States v. Stephens*, __F. Supp. 3d __, No. 15-cr-95 (AJN), 2020 WL 1295155, at *2–3 (S.D.N.Y. Mar. 18, 2020); *United States v. Perez*, No. 19 Cr. 297 (PAE), 2020 WL 1329225 (S.D.N.Y. Mar. 19, 2020)); (Reply at 4) (citing *United States v. Ramos*, No. 18-CR-30009-FDS, 2020 WL 1478307 (D. Mass. Mar. 26, 2020); *United States v. Clark*, No. 19-40068-01-HLT, 2020 WL 1446895, at *3 (D. Kan. Mar. 25, 2020); *United States v. Buswell*, No. 11-CR-198-01, 2013 WL. 210899, at *5 (W.D. La. Jan. 18, 2013)).

### 1.   Danger to the Community

The Court finds that Williams has not met the burden of establishing that he is not a danger to the community.  The COVID-19 pandemic has no bearing on this issue. Previously, the Court applied the factors of § 3142 in assessing Williams' danger to the community, and considered the nature and circumstances of the offense charged, including whether it involves a firearm.  The victim of the underlying conduct that led to Williams' federal charge reported that Williams drew a firearm and threatened him.  (PSR ⸿ 9.) Although Williams denies that he brandished a firearm, (*see* Reply at 3), the victim correctly identified Williams as being in possession of a firearm.  (PSR ⸿⸿ 9, 14, 16; Compl. Aff. [Doc. No. 1-1] ⸿ 5.)

Williams has a lengthy criminal history, irrespective of the more recent domestic assault charge that has been dismissed, and irrespective of his discharge from probation in two counties.  As the Government notes, although Williams is only 29 years old, this is his fifth offense involving a form of firearms possession.  (PSR ⸿⸿ 36, 38, 40, 42, 45.)  His criminal history includes numerous acts of violence.  (*Id.* ⸿⸿ 40 (2d Degree Assault conviction stemming from Williams arguing with another bus passenger, then shooting the victim in the hip with a sawed-off shotgun); 41 (conviction for aiding and abetting an offender involving the robbery of a 91-year old victim's purse at a drug store); 42 (conviction for unlawful possession of a firearm resulting from brandishing gun in victim's home, stealing personal belongings, and pistol-whipping and threatening to kill the victim); 45 (conviction for aiding and abetting terroristic threats with a coconspirator involving

breaking victim's car windows while brandishing a firearm); 48 (5th Degree Assault conviction for punching a fellow jail inmate three times in the face).)

Moreover, Williams has committed offenses while under judicial supervision, including the instant offense, which he committed while on probation for his two most recent felony drug convictions. (*Id.* ¶¶ 46–47, 52.) Although some recent state court charges against Williams have since been dismissed, Williams' propensity for violence, and his propensity to commit offenses while under supervision, continues to occur. As noted, as recently as March 28, 2020, Williams received a major disciplinary infraction in the Jail for threatening a deputy sheriff and engaging in violent behavior. In sum, the Court finds that Williams fails to show that he poses no danger to the community.

### 2.  Exceptional Reasons

A defendant may appeal a detention order by showing that "there are exceptional reasons why [his] detention would not be appropriate." 18 U.S.C. § 3145(c). In addition to showing exceptional reasons, the defendant must still establish by clear and convincing evidence that he is not likely to flee or pose a danger to the community. *Id.*; *see also United States v. Morris,* No. 17-cr-107(01) (DWF/TNL), 2020 WL 1471683, at *1 (D. Minn. Mar. 26, 2020). As the Court has found, Williams has not shown that he does not pose a danger to the community.

### a.  Health Concerns Due to COVID-19 Pandemic

While the Court is sympathetic to Defendant's concerns about the possibility of contracting COVID-19, many of Williams' concerns are generalized. (Reply at 1) ("Jails are a hotbed for contagion, and this one is no exception.") To the extent that Williams

speculates about inmates "cycl[ing] in and out of the [J]ail regularly," and the lack of "any mitigation measures," (Def.'s Mot. at 6), his concerns are rebutted by Mr. Frank.  As set forth in the Frank Affidavit, the Jail has provided detailed information about the significant steps it has undertaken to prevent and mitigate the risks posed by COVID-19 to inmates' health and safety.  As noted, the Jail quarantines and monitors incoming inmates for a 14-day period, and provides screening and medical care to any current inmates who exhibit signs or symptoms of illness.  Moreover, the Jail has implemented procedures to limit staff time and work space in the facility, limit staff-inmate contact, and is monitoring the health of staff.   In addition, the physical structure and airflow arrangements of the Jail are designed to protect inmates, and have been enhanced to provide even greater measures of protection.  These measures have proven to be effective, as Williams acknowledges that there is currently no outbreak of COVID-19 in the Jail.  (*See id*. at 12.)

As to Williams' contention that his low white blood cell count may place him at "higher risk of getting very sick from COVID-19," he provides a medical record from October 2013, (Sealed Ex. to Reply (Oct. 2, 2013 Med. Record), and a medical record from May 2020 (Sealed Supp'l Ex. (May 8, 2020 Med. Record).)  While Williams refers to his "fragile" health in support of the instant motion, (Reply at 3), he self-reported to U.S. Pretrial Services and Probation, for inclusion in the February 21, 2020 PSR, that he was in "good physical health currently, with no medical conditions."  (PSR ¶ 70.)  As of May 7, 2020, the Jail informed U.S. Probation and Pretrial Services that it possesses no medical records with respect to Williams that identify a medical condition, nor is he prescribed any medication.

14

After receiving permission from the Court to supplement the medical record, Defendant provided May 2020 test results that report his white blood cell count as 3.8 (x 1,000).  (Sealed Supp'l Ex. (May 8, 2020 Med. Record.)  This result may be considered low, based on Defendant's medical reference, which states that normal white blood cell counts are between 4,000 and 11,000 per microliter of blood,  (Reply at 2) (citing WebMD, "What is Low?", https://www.webmd.com/cancer/white-blood-cell-count-low#1-2), but is higher than—and a better result than—his October 2013 medical record, which reported his white blood cell count as 3.5 (x 1,000). (Sealed Oct. 13, 2020 Med. Record.)  The WebMD website cited by Defendant states that blood test results below the normal range "could mean your body may not be able to fight infection the way it should."  WebMD, "What is Low?", https://www.webmd.com/cancer/white-blood-cell-count-low#1-2 (last accessed May 26, 2020).  But Williams provides no documentation of his white blood cell count resulting in any illness or disease at this time, or leading to higher infections in the past.  Based on the current record, the Court is unpersuaded that Williams has a present medical condition that constitutes an exceptional reason warranting his release.

For all of these reasons, the Court finds no exceptional reasons make Williams' continued detention inappropriate under § 3145(c).

### b.  Access to Counsel During COVID-19 Pandemic

Finally, regarding Williams' claim that the Jail's COVID-19 precautions preclude him from having private consultations with counsel, he relies on 18 U.S.C. § 3142(i)(3). (Def.'s Mot. at 13.)  Under this provision, a detention order must "direct that the person be afforded reasonable opportunity for private consultation with counsel," and a judicial

15

officer may, by a subsequent order, permit a defendant's temporary release "to the extent that the judicial officer determines such release to be necessary for preparation of the person's defense or for another compelling reason." 18 U.S.C. § 3142(i). Again, § 3142 applies to the release or detention of a defendant pending trial, while § 3143 applies to Williams—a defendant pending sentencing. Fed. R. Crim. P. 46(a) & (c).

Even if § 3142 applied to Williams now, the Court finds that he has not been deprived of a reasonable opportunity for private consultation with his attorney. Williams does not claim that he is unable to consult with counsel, but speculates that people nearby may overhear his conversations, and that using "this medium to review discovery is unworkable." (Def.'s Mot. at 14.) The only outstanding issue in this case is sentencing, thus the need to review discovery appears to be inapplicable. Given these circumstances, the Court finds that Williams' temporary release is not necessary to prepare his defense, nor does another compelling reason support it. 18 U.S.C. § 3142(i).

In sum, the Court finds no exceptional circumstances under § 3145(c) to support Williams' release from the Jail at this time. *See United States v. Blegen*, No. 19-cr-304 (SRN/TNL), 2020 WL 1619282, at *5 (D. Minn. April 2, 2020) (finding COVID-19 pandemic did not create exceptional reason for release from Sherburne County Jail); *Morris*, 2020 WL 1471683, at *4 (finding, as to a defendant housed in the Sherburne County Jail who cited age and poor health, that COVID-19 pandemic did not constitute an exceptional reason for release); *United States v. Quijada*, No. 19-cr-276 (DSD/TNL), (D. Minn. Mar. 20, 2020 [Doc. No. 32]) (finding COVID-19 pandemic was not an exceptional

reason warranting release from Sherburne County Jail).  For all of the foregoing reasons,

Defendant's Motion for Release is denied.

### III.    CONCLUSION

Accordingly, **IT IS HEREBY ORDERED** that:

**1.**    Defendant's Motion for Reconsideration of Detention and for Temporary Release

[Doc. No. 77] is **DENIED**.

Dated: May 27, 2020

s/Susan Richard Nelson
SUSAN RICHARD NELSON
United States District Judge